# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RODNEY G. PREWITT, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WALGREENS COMPANY, | : | No. 11-02393 |
| Defendant. | : | |

## M E M O R A N D U M

STENGEL, J.                                         February 19, 2015

Rodney Prewitt was employed as a pharmacist at Walgreens. He was demoted and then terminated after voicing a moral objection to vaccinating customers. He claims Walgreens discriminated and retaliated against him because of his age. Walgreens now moves for summary judgment. For the reasons explained below, I will grant this motion and enter judgment in favor of Walgreens.

## I.    BACKGROUND

On August 21, 2006, Rodney Prewitt was hired by Walgreens as a full-time salaried pharmacist.[1] He was 57 at that time.[2] He was assigned to work at the Walgreens

---

[1] Doc. No. 61, Ex. A. at 4; Joint Stipulation (JS), Doc. No. 23 at ¶¶ 2, 5. His designation was "RPS," meaning "Pharmacist Salaried-Drug Store." See also Doc. No. 61-1 at 50.

On January 4, 2012 the plaintiff filed a Joint Stipulation of Facts for Purposes of a Motion for Summary Judgment. Doc. No. 23. The plaintiff contends that the Joint Stipulation was not intended to address facts relating to plaintiff's age discrimination claim." Doc. No. 62 at 1 n. 2 and Doc. No. 64 at 2 n. 2. The plaintiff argues it was only meant to pertain to his wrongful suspension/discharge claim—which he voluntarily withdrew while this motion was pending.

He also argues that the stipulation was essentially mooted by the subsequently filed amended complaint. Despite arguing that the Stipulation does not apply to his age-based claims, the plaintiff cites to the Stipulation throughout his statement of facts and brief in opposition to this motion. See Doc. No. 60 at 2 n. 2, 3-4, 6, 8, 9, 10-11. He concedes "it contains information relevant to his age claims." Doc. No. 70 at 5. He even refers to the Joint

1

store in Oxford, PA on either the day or evening shift.[3] The Oxford store is about eight

miles from the plaintiff's home.[4] At the Oxford store, Mr. Prewitt was one of two full-

time pharmacists, the other being Karen Schneider.[5] Prewitt and Schneider rotated shifts

bi-weekly so that weekend shifts were covered.[6] A third pharmacist Ann Green worked

part-time.[7] Typically, two of the three pharmacists worked each day with their shifts

overlapping between 2:00 p.m. and 4:00 p.m.[8] Only two shifts were available for

---

Stipulation when talking about age-based topics such as "comparators." See Doc. No. 10. In a brief submitted after he withdrew his wrongful discharge claim, the plaintiff also refers back to the Statement of Facts he submitted on March 28, 2014, which cites to the Joint Stipulation. See Doc. No. 64 at 1 n. 1.

I will consider the Joint Stipulation of Facts to be undisputed, despite the plaintiff's contentions. The facts offer information about the circumstances of Mr. Prewitt's demotion and termination. See, e.g., Joint Stipulation, Doc. No. 23 at ¶¶ 20-26. The plaintiff included both his age-based claims and his wrongful discharge claim as alternative theories for relief. See Doc. No. 60 at 3 n. 1, Doc. No. 61-1 at 22. The information contained in the Joint Stipulation would still be relevant to the age-based claims, even if his wrongful discharge claim no longer provides a legal basis for relief. The plaintiff's amendment of his complaint, after the Joint Stipulation was filed, added new legal theories of relief, not new facts. See Doc. No. 24; Prewitt v. Walgreens, No. 11-2393, 2012 WL 4364660 (E.D. Pa. Sept. 25, 2012). In fact, the proposed amended complaint *incorporated* the Joint Stipulation of facts into it. See Doc. No. 26 at 2 n. 1.

Furthermore, to allow the plaintiff to cherry-pick favorable facts and eliminate those which hurt his case in hindsight would contravene the ideals set forth in Rule 1 of the Federal Rules of Civil Procedure. The plaintiff cannot have it both ways. The Joint Stipulation was a way for both parties to more efficiently litigate this case. For the plaintiff to agree to these facts as uncontested and then dispute their usage when they did not suit him is simply unfair.

I will also consider any other relevant documents the parties have submitted for review in this motion. I will cite to each accordingly.

[2] See Doc. No. 61-1 at 4 (DOB 9/18/48).

[3] JS, Doc. No. 23 at ¶ 3; Doc. No. 61 at 35. The Oxford store is #11074. See Doc. No. 61-1 at 37.

[4] JS, Doc. No. 23 at ¶ 4. It is the closest store to the plaintiff's home. Id. at ¶ 43.

[5] Id. at ¶ 7.

[6] See id. at ¶¶ 7-9.

[7] Id. at ¶¶ 7, 10. See also Doc. No. 61 at 37.

[8] Id. at ¶¶ 11-13.

pharmacists at the Oxford store to work because the store was not open twenty-four hours like other Walgreens stores.[9]

### a. Prewitt's Moral Objection to Immunizing

In or around 2009, Walgreens began offering customers the flu vaccine, among others, at the Oxford store.[10] The plaintiff was morally opposed to administering the flu vaccine because a close friend of his had contracted Guillain-Barre Syndrome after receiving a flu vaccine.[11] His friend become paralyzed and died of complications from the disease.[12] The plaintiff believed that there was medical evidence to substantiate such risks of flu vaccines.[13] He did not want to be responsible for putting his patients at risk.[14] The plaintiff voiced his objection to his store manager.[15] He was permitted to not administer flu vaccines.[16] When customers asked for an immunization, he would refer them to another pharmacist or tell them when an immunizing pharmacist was available.[17]

---

[9] Id. at ¶ 19.

[10] Prewitt Dep., Doc. No. 57, Ex. 1 at 73-74, 94-95.

[11] JS, Doc. No. 23 at ¶¶ 58-59. The plaintiff considered his objection to be moral and ethical, not religious, in nature. He based his objection on the idea that he should "do no harm" to his patients. Prewitt Dep., Doc. No. 57 at 89-90.

[12] JS, Doc. No. 23 at ¶¶ 58-59. See Doc. No. 61 at 17-19. The plaintiff included information on others who had health complications from receiving the flu vaccine in his opposition to the summary judgment motion. See Doc. No. 61 at 20-27.

[13] JS, Doc. No. 23 at ¶ 60.

[14] Id.

[15] Prewitt Dep. Doc. No. 57 at 94-95.

[16] JS, Doc. No. 23 at ¶ 97. See Prewitt Dep. Doc. No. 57 at 77-78, 159-61.

[17] JS, Doc. No. 23 at ¶ 98.

### b. Walgreens Immunization Program 2010

In 2010, Walgreens made a business decision to provide flu shots during all hours at every one of its stores nationwide. Walgreens planned to heavily market this availability.[18] As a result, Walgreens required all pharmacists to become certified to immunize and to perform flu immunizations for the 2010 flu season.[19] Prior to that time, Walgreens had not required all of its pharmacists to be certified to administer immunizations.[20]

On May 24, 2010, Walgreens enacted a Vaccination Standing Order Protocol.[21] The Protocol was essentially a large-scale prescription which allowed certified pharmacists to administer twenty different vaccines including the flu vaccine in Walgreens stores.[22] As part of the certification process, pharmacists were required to successfully complete an immunization training program.[23]

On July 15, 2010, Walgreens informed employees that it planned to expand its flu and pneumonia vaccination program to stores nationwide.[24] Flu and/or pneumonia

---

[18] Id. at ¶ 99.

[19] Id.

[20] Id. at ¶¶ 95, 96.

[21] Id. at ¶¶ 27-28, at 16-20. See Doc. No. 61 at 7. The protocol is dated April 15, 2010 but the signature by Physician John Hipps is dated May 24, 2010. The Protocol included an addendum listing certified pharmacists and one listing locations where vaccines would be administered. Id. at 11; JS, Doc. No. 23 at 21-25. Mr. Prewitt and the Oxford store were on these lists. See id. at 22, 25.

[22] See Doc. No. 61 at 7-8.

[23] See Doc. No. 61 at 8.

[24] JS, Doc. No. 23 at ¶ 31, at 28. See Doc. No. 61 at 12; Doc. No. 61-2 at 44.

vaccines would be offered daily beginning in September. In preparation for the expanded service, employees were expected to complete the required training course by August 15, 2010.

During the summer of 2010, Walgreens disseminated a new Immunizer Policy (2010 IP) to employees.[25] The 2010 IP explicitly stated that all pharmacists were expected to become certified to immunize and to perform all immunizations.[26] The Policy became effective September 1, 2010. The policy stated, *inter alia*, that "[a]ttempts to provide reasonable accommodation will be made for any pharmacist who provides medical certification of a condition that prevents him or her from performing immunization duties." These reasonable accommodations included, but were not limited to, transfer to a vacant non-immunizer position/shift or assignment as a "floater pharmacist." A non-immunizer shift was described as "any shift designated by Walgreens as not requiring at least one immunizer pharmacist on duty all or part of the shift." "These will be handled on a case-by-case basis between the affected pharmacist and their pharmacy supervisor." Any person requesting an accommodation was required to submit medical documentation explaining the condition and accommodation to his/her supervisor.

On August 17, 2010, Walgreens issued a press release announcing that immunizations would be "available at Walgreens every pharmacy and Take Care Clinic

---

[25] JS, Doc. No. 23 at ¶ 29.

[26] Doc. No. 61-2 at 8-9.

nationwide, every day, during nearly all pharmacy and clinic hours – with no appointment necessary."[27] Other correspondence to employees in August made clear that Walgreens planned to market the readily available flu vaccine to customers.[28]

### c. Scheduling during the 2010 Flu Season

The immunization certification took several weeks to be processed by the state of Pennsylvania.[29] Walgreens allowed many pharmacists to work though they were not certified before the September 1, 2010 deadline.[30] At certain times during the 2010 flu season, Walgreens did not have enough immunizing pharmacists to cover all shifts between 8:00 a.m. and 10:00 p.m. in all stores.[31] As a result, Walgreens did not offer vaccinations at certain stores in Pennsylvania during certain times.[32] Signs were posted to alert customers to the unavailability of immunizations during those times and information

---

[27] JS, Doc. No. 23 at ¶¶ 33-34, at 29; Doc. No. 61 at 13.

[28] See Doc. No. 61 at 29. Several emails sent to employees from the plaintiff's supervisor in August 2010 indicate as much. Id. at 29-34. One email sent on August 25, 2010 from the plaintiff's pharmacy supervisor stated: "WE do not see our employees talking to customers about the flu shot….This is our best kept SECRET!!!!! Rite Aid has EVERYONE with Buttons 'Ask about a Flu Shot.' 5 Minute Meetings TODAY about pushing the Flu Shots…" Id. at 29. Another said, "Everybody give a Flu Shot Today!!!!" Id. at 31. These bi-weekly emails reported the flu shot sales totals for various Walgreens' regions on the East Coast. See also Prewitt Dep., Doc. No. 57 at 171-73.

[29] JS, Doc. No. 23 at ¶ 102.

[30] Id. There were 78 pharmacists in Pennsylvania, including Mr. Prewitt, who were not certified to immunize as of September 1, 2010 but were permitted to work between September 1, 2010 and October 15, 2011. Id. Three of these pharmacists did not end up getting certified. One is on long-term disability. Another moved out of state before the certification could be completed. The third left Walgreens before the certification process was complete. Id. at ¶ 108. All three were still employed at Walgreens as of October 15, 2011. None had an objection to immunizing. Id. at ¶ 109.

[31] Id. at ¶ 117.

[32] Id. at ¶¶ 113-16.

about when immunizations would be available.[33] Sometimes, certain Walgreens stores scheduled customers for vaccination appointments when immunizing pharmacists would be available.[34] Customers were also referred to other Walgreens stores where immunizations were available.[35] To allow for expanded immunizations, Walgreens also hired additional pharmacists in its Pennsylvania stores.[36]

### d.  Plaintiff's Conscience Objection and Change in Job Status

After learning of the 2010 IP, the plaintiff informed his District Pharmacy Supervisor Phillip Anderson of his moral objection to administering flu vaccines. Anderson oversaw the enactment of the 2010 IP at several Walgreens stores, including the Oxford store. The plaintiff told Anderson that he was willing to become a certified immunizer, but he objected to immunizing as a matter of conscience.[37] The plaintiff signed up for the required certification course in August 2010.[38] However, he asked to continue working full-time as a non-immunizing pharmacist.[39] Prewitt also made his objection known to other Walgreens personnel, including Oxford store managers.[40] Mr.

---

[33] Id. at ¶¶ 113-14.

[34] Id. at ¶ 118.

[35] Id. at ¶ 119.

[36] An additional 22 uncertified pharmacists were hired or transferred into Pennsylvania since September 1, 2010. Id. at ¶ 110. All 22 eventually obtained their certifications and began immunizing customers. Id. at ¶ 111.

[37] Id. at ¶¶ 56, 61, 62.

[38] Id. at ¶ 64.

[39] Id. at ¶ 63.

[40] Id. at ¶ 57.

Prewitt was the only pharmacist employed in Pennsylvania who objected to immunizing.[41]

Anderson believed Prewitt's objection to be sincere.[42]  In July or August, Anderson advised the plaintiff that he would be put on "floater" status beginning in September until the flu season was over.[43] In an email dated August 23, 2010, Mr. Anderson asked the plaintiff if he would be willing to work overnight shifts (7 days on, 7 days off) in the York, PA store because he would not be licensed to immunize by September 1, 2010.[44] Anderson had also offered this overnight shift to two other pharmacists who had not yet gotten certified.[45] The plaintiff refused this alternative schedule because the hours were a significantly less than his regular schedule, the York store was forty-seven miles from his home, and he had "medical concerns identified by his physician and worries about the safety of him and his wife."[46]  The plaintiff was not offered any other shifts in September beyond those available in York.[47]

---

[41] Id. at ¶¶ 103, 104.

[42] Anderson Dep., Doc. No. 60, Ex. B at 105, 110-11.

[43] Id.

[44] JS, Doc. No. 23 at ¶ 65, at 30; Doc. No. 61 at 28. The Oxford store's pharmacy was not open twenty-four hours; the plaintiff could not work an overnight shift there. As of August 31, 2010, the pharmacy the Oxford Store was open from 8:00 a.m. until 10:00 p.m., 6 days a week, and from 9:00 a.m. until 5:00 p.m. on Sundays. JS, Doc. No. 23 at ¶ 6.

[45] Anderson Dep., Doc. No. 60, Ex. B at 215-16.

[46] JS, Doc. No. 23 at ¶¶ 66-67; Doc. No. 64 at 5 n. 2. See also Prewitt, Dep., Doc. No. 57 at 153.The plaintiff contends he worked 20 shifts on average per month. Doc. No. 64 at 5.

[47] JS, Doc. No. 23 at ¶ 71.

### e.  Schedule of Pharmacists at the Oxford Store

Throughout August 2010, the plaintiff was scheduled full-time in the Oxford store as a non-immunizing pharmacist.[48] On September 4, 2010, the plaintiff's employment was officially changed from full-time RPS at the Oxford store to "Floater pharmacist," which meant the plaintiff was no longer salaried and only was paid for the shifts he worked.[49] The plaintiff was the only employee under Anderson's supervision who was placed on "floater" status.[50]  After September 3, 2010, the plaintiff was not scheduled to work at the Oxford store.[51] The other two Oxford store pharmacists, Karen Schneider and Ann Green, continued to work their regular schedules after the immunization season began.[52] Both had become licensed immunizers by August 31, 2010.[53]

In September, David Reinertsen began working as the second full-time pharmacist at the Oxford store.[54] He was a licensed immunizing pharmacist.[55] Mr. Reinertsen is six

---

[48] Doc. No. 61 at 35-36. He was scheduled to work full time in June and July as well. See Doc. No. 61-2 at 23-31.

[49] JS, Doc. No. 23 at ¶¶ 68-69. See Doc. No. 61 at 40.

[50] Anderson testified that this change was made because the plaintiff was not certified to immunize. Anderson Dep., Doc. No. 60, Ex. B at 120. According to Anderson, Prewitt was the only person under his supervision who was not yet certified to immunize. Id. Anderson did not consider or offer to move the plaintiff to another store under another supervisor. Policy did not prohibit this transfer but also did not require it. Id. at 130-32. None of the other uncertified pharmacists in the state of Pennsylvania were placed on "Floater status" effective September 1, 2010 as a result of their lack of immunization certification. JS, Doc. No. 23 at ¶ 105.

[51] See Doc. No. 61 at 36-39.

[52] Id. at 37-39.

[53] JS, Doc. No. 23 at ¶ 14.

[54] Doc. No. 61 at 36.

[55] Id.

years younger than the plaintiff.[56] He continued working full-time at the Oxford store as an immunizing pharmacist.[57] All the pharmacists covering shifts at the Oxford store after September 1 were immunizing pharmacists.[58]

### f.   Communications Between Prewitt and Anderson in Fall 2010

On September 15, 2010, Mr. Prewitt sent Mr. Anderson an email titled "Follow up to our 09/02 conversation."[59] Mr. Prewitt indicated the two had discussed his temporary removal from the Oxford store on September 2, 2010. [60] Prewitt said that he had explained at that time that he had completed the required training but his Pennsylvania Immunizer certification had not been processed. [61] He asked Anderson to send him "written documentation" which he had been promised. [62] Anderson responded with the "Performing Immunization Duties" from the 2010 IP, which states that all pharmacists were expected to become certified and administer immunizations.[63]

---

[56] See Anderson Dep., Doc. No. 60, Ex. B at 167-68; Doc. No. 60 at 19.

[57] Doc. No. 61 at 37.

[58] See Doc. No. 61 at 37. Several other immunizing pharmacists were added to cover immunizing pharmacists who were off. Though these pharmacists were only scheduled to work at the Oxford store one day in two weeks, their total hours scheduled showed them to be working full-time hours for the company. See id. at 38-39.

[59] Doc. No. 61 at 40-41.

[60] Id. at 40.

[61] Id. at 40-41. There is a processing delay between the time a person completes a certification course and when he can become licensed in Pennsylvania. See id. at 40, 48.

[62] Id. at 40-41.

[63] JS, Doc. No. 23 at 31. This was the same language included in the 2010 IP that was previously disseminated. Compare JS, Doc. No. 23 at 26, 31; Doc. No. 61 at 40; Doc. No. 61-2 at 8-9.

On November 4, 2011, the plaintiff became certified to administer immunizations.[64] On November 15, 2010, Mr. Anderson emailed the plaintiff stating the plaintiff's license had been approved.[65] He would return the plaintiff to full time hours if Mr. Prewitt agreed to immunize. The plaintiff continued to assert his moral objection.[66]

### g.  Plaintiff's Demand Letter, Doctor's Note, and Correspondence with Walgreens' Counsel

On October 5, 2010, the plaintiff's attorney sent Walgreens a letter demanding reinstatement of the plaintiff to his former position.[67] The letter documented the plaintiff's objection to providing immunizations "on the grounds of his moral/ethical and/or religious beliefs," citing to the "PA Conscience Policy," 49 Pa. Code. § 27.103.[68] The letter went on to allege that Mr. Prewitt had been subject to age discrimination because "certain younger Walgreens' pharmacists employed near Oxford in Pennsylvania who have not raised conscience objections are working despite non-compliance with Walgreens' alleged policy, thus implicating retaliatory intent, as well as the Age Discrimination in Employment Act 29 U,S.C. 9621, et seq. ('ADEA')." These two younger employees were allegedly permitted to work their regular shifts at the Lancaster

---

[64] Id. at ¶ 76. See Prewitt Dep., Doc. No. 57 at 165.

[65] JS, Doc. No. 23 at ¶ 78, at 42; Doc. No. 61-1 at 16.

[66] JS, Doc. No. 23 at ¶ 79.

[67] JS, Doc. No. 23 at 32-36; Doc. No. 61 at 42-43.

[68] JS, Doc. No. 23 at ¶ 72.

store though they were not certified to immunize.[69] The rest of the letter discussed Walgreens' immunization policies and the plaintiff's changed work status after the policies were implemented.

Attached to the letter was a note from the plaintiff's family doctor dated August 26, 2010.[70] The doctor advised Walgreens that the plaintiff should not be required to administer vaccines because "he has significant and sincere aversions due to his own personal experience with a serious adverse reaction that resulted in a death of a friend and also due to his real concerns for patient safety." His doctor believed requiring Mr. Prewitt to act against these beliefs would "create undue stress and cause significant illness."[71] He also advised that if Mr. Prewitt worked an overnight shift "at a store some distance from his home…such a schedule would be deleterious on his health and well being" because of his known cardiac disease. The doctor noted that Mr. Prewitt was concerned about leaving his wife alone overnight in their "very rural" home since she has "medical issues that would be aggravated" by his working overnight."[72]

---

[69] The letter did not name the two men. However, the plaintiff identified in them in his deposition as Hung Luu and Hiren Patel. See Prewitt's Dep., Doc. No. 57, Ex. 1 at 153.

[70] JS, Doc. No. 23 at ¶ 73, at 37; Doc. No. 61 at 47. Though the letter was dated August 26, 2010, this was the first time the plaintiff notified the defendant of his need for an accommodation for medical reasons. See Doc. No. 61 at 48.

[71] The doctor did not specify what type of illness the plaintiff was at risk of contracting.

[72] What type of illness his wife had was not specified.

Walgreens' Senior Attorney Stephanie Gaines responded to plaintiff's counsel on November 3, 2010.[73] She acknowledged that "Walgreens has recently made the business decision to increase the availability of immunizations in its pharmacies." As a result, Walgreens' policy on how it handled scheduling immunization shifts had changed. Ms. Gaines explained that Walgreens expected to have Mr. Prewitt return to working day and evening shifts in the Oxford store once the flu season ended on January 31, 2011.[74]  To accommodate his continued objection, the plaintiff was offered ten day shift hours per week at the York store.[75] These hours would have overlapped with when immunizing pharmacists were working.[76] Mr. Prewitt did not accept this alternative schedule.[77]

The plaintiff's attorney responded to this letter on November 10, 2010.[78] He reiterated his position about the plaintiff's demands and claims. He also indicated that the plaintiff had been emailed about available shifts in Newark on November 5 and on Christmas day in two stores in York.

---

[73] JS, Doc. No. 23 at ¶ 74, at 38-39; Doc. No. 61 at 48-49.

[74] Walgreens also offered to discuss disability leave for Mr. Prewitt, based on his doctor's note. It appears that Walgreens may have mistakenly placed Mr. Prewitt on disability leave based on a November 24, 2010. Doc. No. 61-1 at 17. Mr. Prewitt, however, never received disability. He was denied disability because he did not qualify. See Doc. No. 61-1 at 18. Prewitt corresponded with Anderson about clearing up the mistake. Id. at 18.

[75] See Doc. No. 61 at 49.

[76] See Anderson Dep., Doc. No. 60, Ex. B at 217.

[77] JS, Doc. No. 23 at ¶ 75.

[78] See id. at 40.

Ms. Gaines responded to the November 10, 2010 letter.[79] She noted that Mr.

Prewitt was now certified to immunize but that she assumed he still objected to

immunizing. She offered him available non-immunizing shifts in the area: an overnight

shift on Mondays at one store in York and day shifts on Tuesdays and Fridays at another

store in York.[80] He did not accept this offer.[81]

### h.  Prewitt's EEOC Charge

On December 18, 2010, the plaintiff filed charges with the EEOC and the

Pennsylvania Human Rights Commissions claiming age discrimination.[82] That same day

plaintiff's counsel faxed the EEOC charge to Ms. Gaines.[83] At that time, the plaintiff was

62. The charge itself claimed that "younger pharmacists…who are similarly not able to

administer flu immunization shots, have since been permitted to work at Walgreens'

stores located within driving range of [the plaintiff's] home." On December 19, 2010,

plaintiff's counsel emailed Mr. Anderson and Ms. Gaines a copy of the EEOC

complaint.[84]

### i.  Prewitt and Anderson's Continued Correspondence

---

[79] Id. at 43-44.

[80] Doc. No. 61-1 at 14. Walgreens was unable to determine what shifts would be available in December. The York stores referenced here is also known as the "Queen" store and the "Market" store. See Anderson Dep., Doc. No. 60, Ex. B at 216-17.

[81] JS, Doc. No. 23 at ¶ 82.

[82] Doc. No. 61-1 at 23-30.

[83] Id. at 21-30.

[84] Id. at 31.

On December 27, 2010, the plaintiff emailed Mr. Anderson to ask about his pay for the December 12/10/10 and 12/24/10 pay periods.[85] He said that he had received pay in his last direct deposit for one vacation day and five sick days. He claimed he still had sick days left to use. Anderson responded and asked how Prewitt wanted to be paid. Prewitt replied that he would like to take his remaining sick days. If he could not use them, he "would just not get paid."

### j.   Walgreens 2011 Immunization Policy

On January 12, 2011, Sherri Trotz, Walgreens' Executive Pharmacy Director for Midwest Pharmacy Operations, issued a "Revised Immunizer Policy: Effective 3/1/2011."[86] The Policy was distributed to Walgreens' managers including Mr. Anderson. On February 15, 2011, Walgreens informed its pharmacy supervisors that the policy was to be communicated to all pharmacists.[87] It stated that non-immunizing pharmacists displaced during the past flu season should return to their prior position or schedule "if possible" after March 1, 2011. However, they were expected to become immunizers or work non-immunizing shifts "when available" after September 2011. Non-immunizing shifts were "mid-shifts" or day shifts at a "Take Care Clinic." It specifically stated that non-immunizing pharmacists may have to work less hours. If a non-immunizer were to be displaced due to a lack of shifts, he could be terminated or

---

[85] Doc. No. 61-2 at 43.

[86] See Am. Compl., Doc. No. 38-1 at ¶ 92. Revisions to this Policy were presented at a Market Leadership Meeting on January 12, 2011 by Sherisse Trotz. See Doc. No. 61-1 at 38-45.

[87] Id. at 26-27; Doc. No. 61-1 at 12-13.

eligible for disability. Anderson understood the 2011 IP to mean that pharmacists either had to immunize or had to work non-immunizing shifts.[88]

### k.  Plaintiff's "Retroactive Termination"

On January 21, 2011, the plaintiff emailed Anderson about his return after the flu season had ended.[89] Prewitt indicated he was no longer able to access information regarding scheduling, pay, etc. through the Walgreens' website. He asked if he would be returning to his full time position at Oxford and whether he'd be expected to immunize. He also noted that he had taken sick days to cover two eye surgeries. On January 28, 2011, Ms. Gaines requested to see Mr. Prewitt's personnel file.[90]

Walgreens' flu immunizing season ended on January 31, 2011.[91] On February 2, 2011, Mr. Anderson emailed Mr. Prewitt about returning to work "as soon as possible."[92] Mr. Anderson asked Mr. Prewitt whether his objection extended to other vaccines beyond the flu vaccine or whether he would be employed as a non-immunizing pharmacist.[93]

---

[88] Anderson Dep., Doc. No. 60, Ex. B at 247-48.

[89] JS, Doc. No. 23 at ¶ 88, at 47; Doc. No. 61-1 at 32.

[90] Doc. No. 61-1 at 33.

[91] JS, Doc. No. 23 at ¶ 89. Anderson testified that the flu season had not actually ended on this date. Anderson Dep., Doc. No. 60 at 234-35. The parties have stipulated to the above. However, even if there was a dispute about the end date, it would not be a dispute material to the outcome in this case. From Anderson's testimony, it appears the flu season would have wrapped up by the time Prewitt did return, if his objection had only applied to the flu vaccine. Mr. Prewitt also objected to administering *any* immunizations. By all accounts, Walgreens' immunizations of other vaccines would be ongoing throughout the year. The flu season end date would have been irrelevant to administering the other vaccinations.

[92] JS, Doc. No. 23 at ¶ 90 at 48; Doc. No. 61-1 at 34.

[93] On January 31, 2011, Mr. Anderson sent a draft of this email to Ms. Gaines, who subsequently edited it. See Doc. No. 61-1 at 34; Anderson Dep., Doc. No. 60, Ex. B at 225. The content of the email remained substantially the same.

On February 4, 2011, the plaintiff responded by saying that he expected to return to his former position as a pharmacist in the Oxford store.[94] He stated that he would support the immunization programs but maintained his "conscience objection to injection of any vaccines, regardless of type." [95] He then stated that if he was not given written notification within five business days of a specific date on which he could return to work at the Oxford store, he would consider his employment to have been terminated by Walgreens. Neither Mr. Anderson nor any other Walgreens employee responded to his email.[96]

On February 14, 2011, Mr. Prewitt was sent a COBRA notice which stated that his healthcare coverage had ended on December 13, 2010 when he was terminated.[97] On March 5, 2011, Mr. Prewitt received a letter from the profit-sharing department stated his employment with Walgreens had ended on December 13, 2010.[98] With the exception of accrued vacation pay, the plaintiff was not paid throughout the 2010-2011 flu season.[99]

## II.    PROCEDURAL HISTORY

---

[94] JS, Doc. No. 23 at ¶ 91, at 49; Doc. No. 61-1 at 37.

[95] The plaintiff claimed his views about administering vaccinations as a practice changed after he attended his training in August 2010. Prewitt Dep., Doc. No. 57, Ex. 1 at 78-84. See also Anderson Dep., Doc. No. 60, Ex. B at 281-82.

[96] JS, Doc. No. 23 at ¶ 92.

[97] Id. at ¶¶ 83, 84, at 45; Doc. No. 61-1 at 19.

[98] JS, Doc. No. 23 at ¶¶ 85, 86 at 46; Doc. No. 61-1 at 20.

[99] JS, Doc. No. 23 at ¶ 93.

On April 6, 2011, the plaintiff filed this complaint against Walgreens. The original complaint included a federal claim of age discrimination under the Age Discrimination Employment Act (ADEA) and a state law claim of "wrongful discharge in violation of Pennsylvania's public policy" embodied in the PA Conscience Policy.

After several motions for extensions of discovery deadlines requested by the plaintiff, the six-month discovery period ended. The plaintiff then filed a motion to amend his complaint. I allowed the plaintiff to amend his complaint to include a state law claim of age discrimination and retaliation claims under state and federal law for age discrimination. I denied his request to add discrimination claims based on religion or disability under state law and Title VII. I also denied his request to add a claim for wrongful discharge under the Pennsylvania Constitution.[100]

Three months later, the plaintiff filed a second complaint against Walgreens. See 12-cv-6967 (E.D. Pa.). This complaint included a "wrongful suspension claim" under what the plaintiff referred to as the Pennsylvania public policy "embodied in sections of Article 1 of the Pennsylvania Constitution." I dismissed that complaint based on both legal substantive deficiencies in the complaint and principles of *res judicata*.[101]

The defendant filed this motion for summary judgment. At the close of discovery, the parties filed a joint stipulation of facts for purposes of a motion for summary

---

[100] See Prewitt v. Walgreens, No. 11-2393, 2012 WL 4364660 (E.D. Pa. Sept. 25, 2012).

[101] See Prewitt v. Walgreens, No. 12-cv-6967, 2013 WL 6284166  (E.D. Pa. Dec. 2, 2013).

judgment.[102] After the parties had fully briefed the motion for summary judgment, the plaintiff moved to withdraw Count III—his wrongful discharge/suspension in violation of public policy claim—with prejudice.[103] I granted the plaintiff's motion to withdraw Count III because, as the plaintiff argued, Count III was legally deficient.[104]

The remaining claims at issue in this motion pertain to discrimination based on age: Count I for age discrimination claim under the ADEA and the Pennsylvania Human Rights Act (PHRA) and Count II for retaliation claim under the ADEA and PHRA. Essentially, the plaintiff is now claiming his termination was because of his age and not because he refused to administer flu vaccines.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party" based on the evidence in the record. Anderson v.

---

[102] See Doc. No. 23.

[103] Whether this claim was for suspension or discharge or both was entirely unclear. In the amended complaint the plaintiff filed, after I granted him leave to do so, he also changed his "wrongful discharge" count to one of "wrongful suspension." See Doc. No. 38, Ex. 1. This change was not a part of his proposed amended complaint. See Doc. No. 26, 30. In his response to the motion for summary judgment, the plaintiff claims that his Count includes both suspension and discharge violations. See Doc. No. 60 at 3. Yet, his later motion to withdraw Count III indicates that the change from "discharge" to "suspension" was intentional. See Doc. No. 65 at 3. He was not granted leave to change this Count. See Prewitt v. Walgreens, No. 11-2393, 2012 WL 4364660 (E.D. Pa. Sept. 25, 2012). Walgreens did not raise this argument with the court and answered the amended complaint as filed. The plaintiff later withdrew this Count, so any problem with the amendment of this count has been mooted. However, this additional amendment was improper.

[104] See Doc. No. 75. I also granted this motion because the defendant did not oppose it. It was not worth having the parties continue to litigate a claim that both agree had no merit. I questioned the propriety of the plaintiff's motion to withdraw, especially in light of the prior procedure in this case and the timing of the motion.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" when it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating to the district court that "there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must draw "all justifiable inferences" in favor of the non-moving party. Anderson, 477 U.S. at 255. The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id. at 252. If the non-moving party has produced more than a "mere

scintilla of evidence" demonstrating a genuine issue of material fact, then the court may

not credit the moving party's "version of events against the opponent, even if the quantity

of the [moving party's] evidence far outweighs that of its opponent." Big Apple BMW,

Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.   DISCUSSION

There are no genuine disputes of material fact.[105] The outstanding issues in

this case can be decided on summary judgment.

### a.  Age Discrimination Under the ADEA and PHRA[106]

The plaintiff concedes that there is no direct evidence of discrimination.[107] ADEA

claims lacking direct evidence are analyzed under the McDonnell Douglas burden

shifting framework. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142

(2000); Barber v. CSX Distribution Servs., 68 F.3d 694, 698 (3d Cir. 1995).  Under

McDonnell Douglas, the plaintiff first has the burden of establishing a *prima facie* case of

---

[105] In the Joint Stipulation, the parties acknowledge that they do not agree about the reason Mr. Prewitt was demoted and/or terminated. JS, Doc. No. 23 at ¶ 105. The defendant has offered a reason for the adverse actions taken against the plaintiff. The plaintiff disputes whether this reason is legitimate. That "dispute" is really a legal argument about whether the reason was pretextual. I will address this legal argument in my pretext analysis.

The plaintiff also claims that "an examination of the Statement of Facts will, alone demonstrate beyond cavil that there are multiple issues of fact that require determination by the trier of fact, and therefore preclude summary judgment of plaintiff's age discrimination claims." See Plaintiff's Response to MSJ, Doc. No. 62 at 2. However, the plaintiff's statement of facts only includes those that are "uncontested." He does not note which are contested. See Plaintiff's Statement of Facts, Doc. No. 60. His memorandum disputes the legal relevance of certain facts (i.e. facts regarding differential treatment of other employees), but he doesn't offer other factual evidence to contradict those facts. Essentially, any disputes between the parties are about whether the defendant's reason for demoting and/or termination the plaintiff was pretextual. That can be legally determined on summary judgment.

[106] The same analysis used for ADEA is also applied to PHRA claims. Fasold v. Justice, 409 F.3d 178, 183-84 (3d Cir. 2005). I would consider the plaintiff's allegations of age discrimination claim under both statutes together.

[107] Doc. No. 64 at 1.

age discrimination: 1) he is at least 40 years of age; 2) he was qualified for his job; 3) he suffered an adverse employment action; and 4) the circumstances of the adverse action give rise to a reasonable inference of age discrimination. See, e.g., Barber, 68 F.3d at 698; Massarsky v. General Motors Corp., 706 F.2d 111, 118 (3d Cir. 1983)("[A] plaintiff alleging a discriminatory layoff need show only that he is a member of the protected class and that he was laid off from a job for which he was qualified while others not in the protected class were treated more favorably.").

### 1.  The Plaintiff Has Established a *Prima Facie* Case

As the defendant admits, the first two parts of the case are easily met: the plaintiff is over age 40 and he was qualified to work as a pharmacist.[108] It is also clear that the plaintiff suffered adverse employment actions: he was demoted from his original position as a salaried pharmacist to that of an hourly "floater;" and he was terminated from employment at Walgreens all together.[109]

For the fourth element, the plaintiff points to several pieces of evidence to show that younger employees were treated more favorably, thereby raising an inference of age discrimination.[110] The plaintiff claims that other non-certified employees in Pennsylvania

---

[108] See Defendant's MSJ, Doc. No. 57 at 21. The plaintiff was 61 when his job title changed; he was 62 when he was terminated and demoted. His date of birth is September 18, 1948. See Compl., Doc. No. 38-1; Doc. No. 61 at 4.

[109] See Defendant's MSJ, Doc. No. 57 at 21. The plaintiff treats these actions as a continuum of discrimination and has not pled them as two separate counts. For this reason, I will analyze them as part of one *prima facie* claim. If his demotion and termination were analyzed as two distinct adverse actions and two distinct *prima facie* claims, it is arguable whether the plaintiff has offered evidence of a *prima facie* case of age discrimination based on his termination. He has failed to offer any evidence that he was replaced by a younger employee after his termination or that other younger employees were returned to their positions after the season.

[110] See Doc. No. 61 at 36; Anderson Dep., Doc. No. 60, Ex. B at 167-68, 19; Doc. No. 64 at 9.

who had the same title as the plaintiff that were not placed on "floater" status. According to the plaintiff, they were allowed to work their regular hours though they were not able to immunize. These employees were sufficiently younger than the plaintiff.

The defendant argues that the plaintiff has not established the fourth element because the other employees to which he points were not suitable comparators or "similarly situated" employees. "[C]omparator employees must be similarly situated in all relevant respects." Wilcher v. Postmaster Gen., 441 Fed. Appx. 879, 882 (3d Cir. Aug. 9, 2011)(adopting standard from other circuits), cert. denied, 132 S. Ct. 1645 (2012); Opsatnik v. Norfolk S. Corp., 335 Fed. Appx. 220, 222-23 (3d Cir. Jul. 9, 2009). To determine whether two employees are "similarly situated," a court should look at whether the employees dealt with the same supervisor, were subject to the same standards, shared similar job responsibilities, and how they may have acted differently. See Wilcher, 441 Fed. Appx. at 881-82; Opsatnik, 335 Fed. Appx. at 222-23.

The plaintiff argues that other non-certified employees are appropriate comparators because they were all employed in Pennsylvania, shared the same job title (RPS) as the plaintiff, worked day and evening shifts, and were not licensed to immunize

---

The Third Circuit has held that no particular age difference be shown to establish that an employee is "sufficiently younger." Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995). A 5 year age differential may suffice to raise an inference of age discrimination. Id. See also Steward v. Sears Roebuck & Co., No. 06-3360, 231 Fed. Appx. 201, 209 (3rd Cir. Aug. 14, 2007)(declining to adopt a bright line rule that 6.75 year age difference between plaintiff and replacement was insufficient to support inference of age discrimination). To determine if the age difference is "sufficient," a court should consider whether "a fact-finder can reasonably conclude that the employment decision was made of the basis of age." Sempier, 45 F.3d at 729.

during the 2010-11 flu season.[111] Specifically, the plaintiff points to Josette Baroudi, 38, who transferred to work at the Lancaster store on November 27, 2011.[112] She was certified in New Jersey but not in Pennsylvania as of that date. On January 7, 2011, Pennsylvania accepted her certification.[113] Ms. Baroudi did work during day and evening shifts (i.e. between the hours of 8:00 a.m. and 10:00 p.m.) between November 27, 2010

---

[111] The plaintiff specifically claims that there were 15 RPS comparators who did not suffer a loss of hours or change of schedule during the 2010-11, despite being non-certified at some point during that period. He claims that all of them are younger than the plaintiff by at least 18 years. See Doc. No. 64 at 7. He does not name the 15 nor cite to information in the record to substantiate this number and claim. Where he does discuss specific non-certified pharmacists in Pennsylvania (i.e. those who were *older* than the plaintiff), he cites to Doc. No. 61-1 at 46-50.

From this cited list, there are sixteen RPS pharmacists in Pennsylvania who were not certified as of September 1, 2010 in compliance with the 2010 IP. All were at least 18 years younger than the plaintiff. I'm assuming that the plaintiff's claims come from this list. Of these fifteen, three pharmacists (Simons, Allen-Myahwegi, and Valenzuela) were certified by September 3, 2010—before the plaintiff was placed on "floater" status. I would not consider them to be comparators for this reason. As for the remaining twelve, the plaintiff has only provided time sheets for those that worked at the Lancaster store. Only one of the remaining twelve—Josette Baroudi—worked at the Lancaster store. For this reason, I can only substantiate the claims made about Ms. Baroudi. As for the other eleven, I cannot necessarily know what hours they were working (i.e. day and evening or overnight), if they were working alone, or whether their store schedule was similar to that of the Oxford store. See Doc. No. 64 at 6 (citing Trotz Dep. At 10)(explaining how usually only larger stores regularly have non-immunizer shifts available). Those points are important because they go to whether accommodations were made for these other non-certified pharmacists which were not made for the plaintiff, such as were made for Ms. Baroudi.

[112] JS, Doc. No. 23 at ¶¶ 25-26; Doc. No. 61-2 at 5-6.

The plaintiff also points to two employees at the Lancaster store as comparators: Hung Luu and Hiren Patel. See Prewitt's Dep., Doc. No. 57, Ex. 1 at 153. It is admitted by Walgreens that both Luu and Hung—who are 26 and 28, respectively—worked daytime shifts in September and October before they were certified to immunize. JS, Doc. No. 23 at ¶¶ 21, 23-25. However, Luu and Hung did not share the same job title as the plaintiff. Luu was also only employed as a part-time pharmacist. JS, Doc. No. 23 at ¶ 21. They were considered RPRs (Regular Pharmacist - Multi-Location – Unassigned), whereas the plaintiff was a RPS (Pharmacist Salaried—Drug Store). The plaintiff himself argues that only RPS pharmacists would be appropriate comparators. See Doc. No. 64 at 7.

The parties also stipulated about several other Lancaster store employees who were permitted to work while not certified. However, none of those were RPS pharmacists like the plaintiff. See JS, Doc. No. 23 at ¶ 106; Doc. No. 61-1 at 46-50. Without more accurate descriptions of what each person's job title involved, I cannot fairly determine that these other pharmacists are similarly situated to the plaintiff. See Wilcher, 441 Fed. Appx. at 881-82; Opsatnik, 335 Fed. Appx. at 222-23. Ultimately, this determination is irrelevant because, as I will explain, the other evidence offered by the plaintiff is enough to raise an inference of discrimination.

[113] JS, Doc. No. 23 at ¶¶ 25-26; Doc. No. 61-2 at 5-6.

and January 6, 2010. Many times, she was working alone in the Lancaster pharmacy though she was not certified to immunize.[114]

During the 2010-11 flu immunization season, Walgreens made several accommodations for pharmacists who were not certified by the September 1, 2010 cut off: they were permitted to work their regular shifts even when they were the only pharmacists working such shifts; the work schedules of other pharmacists were altered to insure that non-immunizing pharmacists were always working with at least one immunizing pharmacist; and the schedule of the non-immunizing pharmacist was adjusted so that they were working shifts besides 8:00 am to 4:00 pm and 2:00 pm to 10:00 pm, if they could not be scheduled to work with an immunizing pharmacist.[115]

Walgreens admits that none of the other Pennsylvania employees, who were non-certified by September 1, 2010, were placed on "floater" status like the plaintiff.[116] Many of these employees were significantly younger than the plaintiff.[117] Walgreens argues that Prewitt cannot compare himself to his colleagues because he was the only one

---

[114] See Doc. No. 61-1 at 9-11.

[115] JS, Doc. No. 23 at ¶ 106.

[116] JS, Doc. No. 23 at ¶ 105. There were 77 pharmacists in Pennsylvania employed with Walgreens who were not certified as of September 1, 2010. See Doc. No. 61-1 at 46-50. An additional 22 were hired or transferred into Pennsylvania after September 1, 2010. Id. at ¶ 110. All but three of these 99 pharmacists eventually became certified. See Id. at ¶ 111. One was on long-term disability. Another moved out of state before the certification could be completed. The third left Walgreens before the certification process was complete. Id. at ¶ 108. All three were still employed at Walgreens as of October 15, 2011. None of these pharmacists had an objection to immunizing. Id. at ¶ 109. Not all shared the same job title as Mr. Prewitt. See Doc. No. 61-1 at 46-50.

[117] See Doc. No. 61-1 at 46-50.

who objected to immunizing.[118] Walgreens contends it would have allowed Mr. Prewitt to do one or more of the three options if he had agreed to immunize once he became certified.[119] While this logic makes sense once Mr. Prewitt did become certified but still objected, it does not explain why he was not permitted to work his regular hours while he was waiting for his certification to become finalized. Other employees were permitted to keep working their regular hours while waiting for their certification. Whether they wanted to immunize or not they would not have been able to do so. Prewitt and his non-certified colleagues would be similarly situated in this regard.[120]

The plaintiff also points out that David Reinertsen, who was about six years younger than the plaintiff, replaced him in the Oxford store in the fall of 2010. Reinertsen was not hired specifically for that role. He was a Walgreens employee transferred from another store to fill in, in Prewitt's absence. It is not clear if he remained at the Oxford store past the fall of 2010.[121] Unlike the plaintiff, Reinertsen was certified to immunize by the September 1, 2011 flu season. Under these circumstances, he would not be considered an appropriate comparator.

---

[118] JS, Doc. No. 23 at ¶¶ 103, 104. The plaintiff claims that four other pharmacists objected as well but he did not know their names. One of the objecting pharmacists was from Delaware. Prewitt Dep., Doc. No. 57 at 145-46.

[119] JS, Doc. No. 23 at ¶ 107.

[120] Walgreens also claims that some of the other non-certified workers, such as Baroudi, are not similarly situated because they worked for a different regional manager with different business needs. See Doc. No. 61-1 at 49; Doc. No. 64 at 7. I do not find this argument persuasive for this step of the analysis. The 2010 IP was supposed to apply to all pharmacy employees. JS, Doc. No. 23 at ¶ 96. However, this information is relevant to showing that Anderson's reason for demoting the plaintiff was legitimate and not pretextual.

[121] In his brief in opposition to the MSJ, the plaintiff stated he "either does not have or cannot at this time locate any schedules for the Oxford store for year 2011." Doc. No. 60 at 18 n. 10. Whether the schedules were not produced or the plaintiff had simply misplaced them is not entirely clear.

Drawing all justifiable inferences in favor of the plaintiff, I find that a fact-finder can reasonably conclude the decision to change the plaintiff's job status to "floater" was made based on age. The plaintiff was told he was not permitted to remain in his original position at the Oxford store because an immunizing pharmacist needed to be available at all times. The scheduling at the Oxford store, where a pharmacist would be alone for all but two hours, prevented the plaintiff from remaining on full time. Yet, the plaintiff has shown that other younger employees, specifically Baroudi, were permitted to work alone while being uncertified. Walgreens also admits that not all stores had immunizers available at all hours on all days during the 2010-11 flu season. Viewing these facts in favor of the plaintiff, the plaintiff's removal from the Oxford store could reasonably have been based on age. The plaintiff has established a *prima facie* case of age discrimination.

## 2.  Walgreens Had a Legitimate, Non-discriminatory Reason

Once the plaintiff has established a *prima facie* case, the law creates a presumption of unlawful discrimination. Barber, 68 F.3d at 698. The burden then shifts to the defendant employer to articulate a "legitimate nondiscriminatory explanation for the employer's adverse employment action." Id. If the employer puts forth a legitimate business explanation, the presumption is rebutted. Id.

Walgreens maintains that it did not suspend, terminate, or place the plaintiff on "floater" status because of his age.[122] He was demoted and later terminated because he

---

[122] JS, Doc. No. 23 at ¶ 105.

refused to immunize customers.[123] After the 2010 IP, administering immunizations

became an essential part of the plaintiff's job. As far back as May 2010, the plaintiff was

notified that this was a mandatory change in his job description. He was the only

pharmacist to be placed on "floater" status in Pennsylvania because he was the only

pharmacist to object to administering vaccinations in Pennsylvania.[124] The plaintiff did

not work while being a "floater" because he refused to work any shifts which were not

his regular ones at the Oxford store.

### 3.  The Plaintiff Cannot Show Pretext

Once the employer rebuts the presumption of discrimination, the burden then

shifts back to the plaintiff to show that the employer's purpose was really a pretext for a

discriminatory motive. Barber, 68 F.3d at 698. "Once the employer answers its relatively

light burden by articulating a legitimate reason for the unfavorable employment decision,

the burden of production rebounds to the plaintiff, who must now show by a

preponderance of the evidence that the employer's explanation is pretextual (thus meeting

the plaintiff's burden of persuasion)." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

To show pretext, a plaintiff "must demonstrate such weaknesses, implausibilities,

---

[123] Id. at ¶¶ 94, 107.

[124] Walgreens also explained that the plaintiff was placed on "floater" status while not being certified while other employees, such as those in the Lancaster store, were permitted to work while not being certified because the Oxford store and the Lancaster store were supervised by different regional managers with different business needs. If Anderson had enough pharmacists willing to immunize under his supervision, it would make sense that he would not use the plaintiff to cover daytime and evening shifts (i.e. peak hours for vaccinations) when an immunizing pharmacist could. See JS, Doc. No. 23 at ¶¶ 41-53. It also makes sense that another manager might let non-certified pharmacists to cover those shifts. If the district supervisor of the Lancaster store did not have enough immunizing pharmacists to cover all shifts, he/she would use what employees under his supervision he did have available to cover those shifts. See JS, Doc. No. 23 at ¶ 25.

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'… and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" (citations omitted). Id. at 765.

The plaintiff does not point to a single shred of evidence to support pretext. To the contrary, evidence in the record shows that the plaintiff himself agrees that his objection to immunize was the reason he was suspended and then terminated. The plaintiff himself testified that his supervisor Mr. Anderson had no dislike for him because of his age or otherwise.[125] The plaintiff testified that he was not allowed to work because of his conscience objection.[126] The plaintiff proceeded under the theory that his suspension/termination were "wrongful" based on his moral objection up until he realized that this claim was legally deficient.  The plaintiff admitted that he knew of no pharmacists who refused to immunize and who continued to be employed at Walgreens.[127]

When asked at his deposition about whether his termination related to his age, the plaintiff testified that he believed he was terminated because of a "combination of [his]

---

[125] Prewitt Dep., Doc. No. 57, Ex. 1 at 99.

[126] Prewitt Dep., Doc. No. 57, Ex. 1 at 141.("Q. Were you told you couldn't work because you weren't licensed, or were you told you couldn't work because you were refusing to give immunizations?...A. Initially, I was told I could not work because I wasn't licensed. Q. And at some later time were you told something else? A. I was never directly told that I couldn't work because of my conscience objection, but it's my belief, to this day, that that's the reason that I have not been allowed to work.").

[127] Prewitt Dep., Doc. No. 57, Ex. 1 at 99. See also JS, Doc. No. 23 at ¶¶ 103-104.

age and conscience objection." He premised his belief that age was a factor on his

knowledge that two other pharmacists at the Lancaster store were allowed to work while

not being certified. Yet, he admitted that neither objected to immunizing.[128] Under a

theory of disparate treatment, the plaintiff must show that the age discrimination was a

*determinative* factor in his termination. See Fuentes, 32 F.3d at 764 (emphasis in

original). Even if age played some role in the plaintiff's demotion and termination, his

age was not the "determinative" factor in the decision to demote him or terminate his

employment.[129] See Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) ("Whatever

---

[128] See id. at 153 ("Q. Do you have reason to believe that your termination was related, in any way, to your age? A. Well, I know that Hiren and Hung were working, and they were younger and I was older and I wasn't. So, I would say maybe it was a combination of the age and conscience objection."). Beyond the fact that Hiren and Hung were working when he was not, he could not offer any other facts that would indicate his termination was related to his age. Id. at 154-56. Hung and Hiren did not object to immunizing customers. See JS, Doc. No. 23 at ¶¶ 103-104. He stated as much in his October 5th demand letter. ("These two gentlemen are distinguished from Mr. Prewitt in at least 2 significant ways: 1) neither has voiced a conscience objection; 2) both are significantly younger than Mr. Prewitt." Doc. No. 61-1 at 44.)

[129] The plaintiff also argues that the defendant's failure to transfer him to the Lancaster store or a closer store to his home (i.e. Walgreens' failure to accommodate his moral objection) is some evidence of pretext. He points to testimony by Trotz and Anderson to show that such transfers were possible. This argument is rather presumptuous under the circumstances. The plaintiff had no right to such a transfer or accommodation. He was an at-will employee. By all accounts, Anderson tried to work with the plaintiff throughout the flu season, offering what shifts he could. The plaintiff refused to work these shifts for one reason or another. He even provided a doctor's note to prevent him from working "too far" from home. He was steadfast in only wanting to work his regular shifts at the Oxford store as a non-immunizer.

The plaintiff's proposed accommodation also did not appear to be entirely plausible from the undisputed facts. There were no open non-immunizing positions available at other stores near the plaintiff's home. Walgreens had several locations within forty miles of the plaintiff's home. At each of those locations, the pharmacists on the day and evening shifts were all licensed and willing to administer vaccinations by September 1, 2010, with the exception of two employees who held different titles than the plaintiff. The Walgreens in Avondale is located approximately fifteen miles from Mr. Prewitt's home. The Kennett Square Walgreens is approximately twenty miles from Mr. Prewitt's home. The Walgreens store in Glen Mills is about thirty miles from his home. The Brookhaven Walgreens is about forty miles from the plaintiff's home. As of September 1, 2010, all pharmacists working first or second shift at the Avondale, Kennett Square, Glen Mills, and Brookhaven stores were licensed and willing to administer immunizations.

the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome"). His objection to immunize was the determinative factor.

The plaintiff's refusal to perform this job function gave Walgreens every right to take an adverse employment action against him. The plaintiff's manager repeatedly testified that, if the plaintiff would have performed immunizations, "I would hire him back, hands down."[130] Anderson offered to return the plaintiff to his previous position at least twice, if the plaintiff agreed to vaccinate. But for the plaintiff's objection to vaccinating, he would have continued working after September 2010. See Gross v. FBL Fin. Servs., 557 U.S. 167, 180 (2009)("[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action. The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision.").

---

Three Walgreens stores located in West Chester were a distance of approximately 25-33 miles from Mr. Prewitt's home. As of September 1, 2010, all pharmacists working first or second shift at the three West Chester stores, with the exception of one pharmacy manager, were licensed and willing to administer immunizations.

The Walgreens store in Chadds Ford is located approximately thirty miles from the plaintiff's home. As of September 1, 2010, all pharmacists working first or second shift at the Chadds Ford store were licensed and willing to administer immunizations, with the exception of one pharmacist designated SP8 (Salaried Pharmacist 8 Shift Schedule). JS, Doc. No. 23 at ¶¶ 41-53.

[130] Anderson Dep., Doc. No. 57, Ex. 2 at 283-84, Doc. No. 60 at 211.

Even drawing all reasonable inferences in favor of the plaintiff, it is clear that Walgreens demoted and then terminated the plaintiff because he refused to perform immunizations which became an essential part of his job.[131] The facts are clear. The plaintiff's difficulties with his employer started when Walgreens enacted the 2010 IP, formally requiring all pharmacists to vaccinate. Every correspondence between the plaintiff and his employer involved his objection to immunizing. For almost the entirety of this case, beginning with his October 5th demand letter, the plaintiff claimed he was wrongfully suspended/discharged because of his moral objection. While the burden of production shifts between the parties, the ultimate burden of persuasion remains with the plaintiff at all times. Reeves, 530 U.S. at 142 (citing Burdine, 450 U.S. at 253). The plaintiff has failed to show that the defendant demoted and terminated him based on age discrimination. His ADEA and PHRA discrimination claims are without merit.

### b.  Plaintiff's Retaliation Claims Under ADEA and PHRA[132]

ADEA retaliation claims are also governed by the McDonnell Douglas burden shifting framework. Klastow v. Newtown Friends Sch., 515 F. App'x 130, 132 (3d. Cir. 2013) (citing Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005)). A plaintiff must show that: he engaged in protected activity, he was subject to adverse action by the employer at the same time as or after the protected activity, and there was a causal connection

---

[131] Doc. No. 61-2 at 8-9.

[132] The analysis under the ADEA and the PHRA for a retaliation claim is the same. Fasold v. Justice, 409 F.3d 178, 189 (3d Cir. 2005).  I will analyze both claims together.

between the protected activity and the adverse action. Id. The plaintiff has offered enough to establish a *prima facie* case of retaliation related to his termination: he filed an EEOC charge in mid-December 2010 which he forwarded to Ms. Gaines and Mr. Anderson; he was not returned to his previous position in February 2011 though he was told he would be reinstated at the end of the flu season; and the timing of the two events can implicate a causal connection.[133]

The burden then shifts to the employer to rebut the presumption of retaliatory intent. Again, the defendant states that the plaintiff was terminated because he refused to perform any vaccinations. After the 2010 IP, vaccinating became an essential job duty of all pharmacists. The 2011 IP reaffirmed this point. In light of the defendant's decision to make vaccinations more available at all their stores, their decision to terminate the plaintiff for refusing to immunize is a legitimate, nondiscriminatory rebuttal to the presumption of retaliatory intent.

---

[133] Only actions taken by the defendant after October 5, 2010 can be considered retaliatory. Before that point, the plaintiff did not put the defendant on notice of his possible age discrimination complaint. See Am. Complaint ¶ 54; Stipulation ¶ 72.

There is an implied dispute about whether Mr. Anderson knew about the EEOC charge when the plaintiff was terminated. Anderson was emailed the charge. Anderson testified that he did not receive these emails. Anderson Dep. Doc. No. 57, Ex. 2 at 286. This dispute is not material. Even if Anderson did know about the EEOC filing, he has offered a legitimate reason for terminating the plaintiff—his refusal to immunize. As I will explain, the plaintiff has failed to show that this reason was pretext for retaliatory intent.

I recognize that final prong of the *prima facie* case is attenuated. When causality is established by "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action," the timing between the two events should be "very close." Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001). While two months may not be "very close," it could be considered close enough under the circumstances of this case. Given that the plaintiff was expected to return to his job in February, the termination's timing close to two months after the EEOC charge had been filed would make sense. He was expects not to return to work until February. Viewing these facts in favor of the plaintiff, this set of circumstances could show causality.

If the employer offers a legitimate, nondiscriminatory reason for terminating the plaintiff, the burden returns to the plaintiff to show this reason was really a pretext for an illegitimate motive. To show pretext regarding his termination, the plaintiff offers a conspiracy theory. He contends that Anderson's February 2 email was simply a ruse because Anderson "knew when he offered to reinstate Mr. Prewitt on November 15, 2010…Mr. Prewitt would reject this proposal."[134] He claims this email was the "culmination of a plan that was hatched subsequent to November 2010, when [Walgreens] offered to unconditionally reinstate him when the flu season ended, a plan that germinated when it received his EEOC charge on December 18, 2010 – the extraction of Mr. Prewitt's 'voluntary resignation,' which was in fact a constructive discharge."[135] This is nonsense. What reason would Walgreens have to string the plaintiff along for two months, waiting for him to file an EEOC charge, in order to "extract" Mr. Prewitt's "voluntary resignation?"[136] The plaintiff himself admits that Mr. Anderson had no ill will against him.

---

[134] Doc. No. 64 at 18. The plaintiff contends that he notified Anderson as early as January 2010 of "his conscience-based objection to administering vaccinations *of any kind*." Plaintiff's Statement of Facts, Doc. No. 60 at ¶ 17 (emphasis in original). He cites to Anderson's testimony to support this point. See id. at ¶ 18. Yet, the plaintiff also indicated he told Anderson his objection was based on his friend receiving the flu vaccine. See id. at ¶¶ 22, 23. Even if the plaintiff had told Anderson before February 2011 that he had an objection to administering other vaccines besides the flu vaccine, it is not unreasonable for Anderson to have confirmed whether the plaintiff's objection extended to other vaccines in February. Mr. Prewitt's formal objection to vaccinating was related to the flu vaccine. See Plaintiff's Statement of Facts, Doc. No. 60 at ¶ 31; JS, Doc. No. 23 at ¶ 64. This argument is unpersuasive.

[135] Doc. No. 64 at 18.

[136] The plaintiff also argues that Anderson's intervention after the plaintiff mistakenly received a disability letter was also part of this pretextual "plot." The plaintiff received this letter in November. It indicated he would be terminated on December 10, 2010 if he didn't speak to his employer. He contacted Anderson about the letter. Anderson said he would work on resolving the issue. The plaintiff implies that Anderson's efforts in this regard are insidious. See

The plaintiff also argues that the date of his termination being made retroactive to December 13—5 days before his EEOC charge was filed—is suspicious.[137] Yet, he offers no evidence to explain why this fact shows pretext. See, e.g., Allen v. Petsmart, Inc., 512 F. Supp. 2d 288, 293 (E.D. Pa. 2007) (a plaintiff's "own unsubstantiated, subjective beliefs or suspicions alone would not suffice to persuade a rational trier of fact that age was a factor in the termination decision"); see also Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990) (affirming summary judgment and finding that inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment); Martin v. Healthcare Bus. Res., No. 00–3244, 2002 WL 467749, at *6 (E.D. Pa. Mar. 26, 2002) ("Plaintiff's mere pronouncement or subjective belief that she was terminated because of her race, gender and age is not a substitute for competent evidence.").

The plaintiff had not been working since September 2010. Any payments he received thereafter were for accrued vacation time. By all accounts, Mr. Prewitt and Mr. Anderson had expected he would return to work in February 2011, after the flu season

---

Plaintiff's Statement of Facts, Doc. No. 60 at 24-25. To the contrary, Anderson's intervention further bolsters his contention that the plaintiff's objection only related to the flu vaccine and that he planned for him to return to work after the flu season had ended. This argument is meritless.

[137] Doc. No. 64 at 21. The plaintiff notes that the COBRA notice was untimely, being sent two months after he was terminated. Doc. No. 64 at 20. However, he has not asserted an ERISA claim and did not seek to bring forth a claim before this mention in his brief on April 15, 2014. To support his alleged COBRA violation, he claims the defendant destroyed the notice of his termination sent to the plan administrator. Doc. No. 64 at 20. Again, no issue of spoliation was raised before this point. Though he claims there is evidence to suggest spoliation, he cites to none. Then, based on this unsubstantiated spoliation theory, he argues that the plaintiff's termination was, in fact, in February after Mr. Prewitt rejected Walgreens' reinstatement offer. Doc. No. 64 at 20. I'm not really sure what to make of these allegations or how they may help the plaintiff's case. Instead, the plaintiff's admission that the defendant likely terminated him retroactively after he rejected their offer of reinstatement only seems to bolster the defendant's argument that he was terminated because he would not administer vaccines.

had ended. Mr. Prewitt was unwilling to comply with the new 2011 IP and to administer *any* vaccinations (not just the flu vaccine). He made Anderson aware of this point in February and would only accept a return to his prior position which required he be a certified immunizer. Given this chain of events, it makes complete sense that his healthcare coverage and profit-sharing employee benefits would be terminated retroactively. I see no pretext in his retroactive termination.

The facts are clear. Walgreens made a business decision to market vaccinations, specifically the flu vaccine. Mr. Prewitt did not agree with this decision and voiced a moral objection. He refused to perform an essential part of his job. Though Mr. Prewitt's objection may have been genuine and sincere, he has not established any unlawful discrimination by his employer.

## V.    CONCLUSION

For the reasons stated above, I will grant the defendant's motion for summary judgment and enter judgment in favor of the defendant.

An appropriate Order follows.